TOGUT, SEGAL & SEGAL LLP
Bankruptcy Co-Counsel for Enron Corp, *et al.*
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Frank A. Oswald (FAO-1223)
Scott E. Ratner (SER-0015)
Howard P. Magaliff (HPM-2189)

SQUIRE, SANDERS & DEMPSEY L.L.P.
Counsel for the Official Committee of
Unsecured Creditors of ENRON CORP, *et al.*
312 Walnut Street, Suite 3500
Cincinnati, Ohio 45202-4036
(513) 361-1200
Stephen D. Lerner (SL-7598)
        and
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114-1304
(216) 479-8500
Howard J. C. Nicols (HN-3594)

UNITED STATES BANKRUPTCYCOURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                                             :
In re:                                                       :          Chapter 11
                                                             :          Case No. 01-16034 (AJG)
ENRON CORP., *et al.*,                                       :
                                                             :          Jointly Administered
                                        Debtors.             :
                                                             :
-------------------------------------------------------------x
                                                             :
ENRON CORP., ENRON NORTH AMERICA                             :          Adversary Proceeding
CORP., ENRON TRANSPORTATION                                  :          No. 03-_____ (AJG)
SERVICES COMPANY and THE OFFICIAL                            :
COMMITTEE OF UNSECURED CREDITORS                             :
OF ENRON *et al.*,                                           :
                                                             :
                                        Plaintiffs,          :
                                                             :
                        v.                                   :
                                                             :
CITIGROUP, INC., CITIBANK N.A.,                              :
CITICORP NORTH AMERICA, INC. and                             :
CITICORP USA, INC.,                                          :
                                                             :
                                        Defendants.          :
                                                             :
-------------------------------------------------------------x

**JOINT COMPLAINT OF THE DEBTORS AND OFFICIAL COMMITTEE
OF UNSECURED CREDITORS FOR THE AVOIDANCE AND
RECOVERY OF PREFERENTIAL AND FRAUDULENT TRANSFERS,
DISALLOWANCE OF CLAIMS AND EQUITABLE SUBORDINATION**

Enron Corp., Enron North America Corp. and Enron Transportation Services Company, as debtors and debtors in possession, and the Official Committee of Unsecured Creditors of Enron Corp. *et al.* (the "Committee"), collectively the Plaintiffs, as and for their Complaint, jointly allege the following upon knowledge as to themselves and their own acts and otherwise upon information and belief:

<u>NATURE OF THIS ACTION</u>

1.        On September 24, 2003, Enron Corp. ("Enron") and Enron North America Corp. ("ENA") sued certain of the Defendants, in addition to numerous other financial institutions, that bear substantial responsibility for the spectacular collapse of what once was the seventh largest corporation in the United States.  That case was assigned Adversary Proceeding No. 03-09266 and currently is pending before this Court (the "Financial Institution Adversary").

2.        The Financial Institution Adversary seeks relief against various financial institutions that participated with a small group of senior officers and managers of Enron (the "Insiders") in a multi-year scheme to manipulate and misstate Enron's financial condition.  The primary purposes of this scheme were (i) to mask a growing disparity between the company's reported revenues, which were increasingly based upon mark-to-market accounting valuations, and its "real" earnings from operations and (ii) to conceal the mountain of debt required to float the company's varied and often unsuccessful business ventures.

3.        The financial institutions helped perpetuate the scheme by designing, implementing, and often financing various structured finance transactions

with knowledge that the Insiders were improperly recording the financial effects of these transactions. For example, financial institutions, including Citibank, made loans to Enron but deliberately disguised these loans as prepay commodity contracts and swaps. These transactions purport to purchase and sell commodities when in fact the transactions were structured to be circular – often with no commodity being transferred at all. These "prepay" transactions routinely closed at the end of a fiscal quarter and were arranged in amounts specifically chosen to inflate Enron's operating cash flow to levels necessary to maintain Enron's credit ratings. The billions of dollars received by Enron from the "prepay" transactions were wrongly recorded as cash flow from Enron's business operations, giving the false appearance that Enron's businesses were healthy while disguising and deepening Enron's insolvency.

4. The damage caused by this overarching scheme is addressed in the Financial Institution Adversary. This adversary proceeding, on the other hand, addresses a discrete transaction (the "Prepay Takeout Transaction") that was consummated to terminate one of those prepays. At bottom, and on the eve of bankruptcy, the Defendants used the Prepay Takeout Transaction to convert the $250 million in unsecured prepetition obligations owed by ENA to Citibank into a secured $250 million dollar obligation of two of Enron's wholly owned subsidiaries - - all of which was accomplished to the detriment of the Debtor Plaintiffs' estates. The Plaintiffs bring this action to avoid the resulting preferential payments, to recover on the fraudulent transfers accomplished through the Prepay Takeout Transaction and to prevent the unjust enrichment of Defendants that would otherwise result from these financial machinations.

## THE PARTIES

### A.    The Plaintiffs

5.    Enron is an Oregon corporation with its principal place of business in Houston, Texas.  Enron is a debtor in possession in this bankruptcy case.  Enron today is neither represented by, nor representative of, the group of corrupt Insiders who contributed to the company's financial collapse.  The Insiders have been expelled from Enron and have been replaced by outside, independent management from Stephen Forbes Cooper, LLC (headed by restructuring specialist Stephen Cooper).  On April 4, 2002, the Bankruptcy Court approved the employment of Stephen Cooper as acting CEO and Chief Restructuring Officer of Enron and certain other employees of Stephen Forbes Cooper, LLC  to act as new officers of Enron effective January 28, 2002.  Mr. Cooper and the new officers were granted full authority to manage and operate Enron's businesses.

6.    Plaintiff Enron North America Corp. ("ENA") is a Delaware corporation with its principal place of business in Houston, Texas.  ENA is a debtor and debtor in possession in this bankruptcy case.  ENA today is under the management of Stephen Forbes Cooper, LLC.

7.    Plaintiff Enron Transportation Services Company ("ETSC") is a Delaware corporation with its principal place of business in Houston, Texas.  ETSC is a debtor and debtor in possession in this bankruptcy case.  ETSC today is under the indirect management of Stephen Forbes Cooper, LLC.

8.    The Committee is the duly appointed official committee of unsecured creditors of the Debtors in the above-captioned jointly administered bankruptcy case.  On December 12, 2001, the U.S. Trustee appointed the Committee.

9.     Enron, ENA, ETSC (the "Debtor Plaintiffs") and the Committee are referred to collectively herein as Plaintiffs.

**B.     The Defendants**

10.     Defendant Citigroup Inc. is a Delaware corporation with its principal place of business at 399 Park Ave., New York, New York 10043.  Citigroup Inc. is a registered bank holding company.

11.     Defendant Citibank, N.A. ("Citibank") is a nationally chartered bank and is Citigroup's principal bank subsidiary with its principal place of business at 399 Park Avenue, New York, New York 10043.  Citigroup Inc. owns and/or controls Citibank.

12.     Defendant Citicorp North America, Inc. ("CNAI") is an individual subsidiary of Citigroup, Inc.  It is a Delaware corporation with its principal place of business at 450 Mamaroneck Avenue, Harrison, New York 10528.

13.     Citicorp USA, Inc. ("CUSA") is a Delaware corporation with its principal place of business at 450 Mamaroneck Avenue, Harrison, New York 10528, and registered agent at CT Corporation System, 111 Eighth Avenue, New York, New York 10011.  Citigroup Inc., Citibank, CNAI and CUSA  are collectively referred to herein as "Citigroup."

### JURISDICTION AND VENUE

14.     On December 2, 2001 (the "Petition Date"), Enron, ENA and ETSC filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court.  Enron, ENA and ETSC continue to be authorized to operate their respective businesses and to manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

15.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1334(b) and 1334(e).  The claims alleged herein are core proceedings under 28 U.S.C. §§ 157(b)(2)(B), (C), (F), (H) and (O).  Pursuant to 28 U.S.C. § 157(a) and 157(b)(1) and the general order of reference of the United States District Court for the Southern District  of New York, this Court may exercise subject matter jurisdiction in this case.

16.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1409(a) because this is a proceeding arising under the Bankruptcy Code, or arising in or related to a case under the Bankruptcy Code.

17.     This adversary proceeding is brought in accordance with Federal Rules of Bankruptcy Procedure 7001, *et seq*., and seeks relief under sections 105(a), 502(d), 510(c)(1), 544, 547, 548 and 550 of the Bankruptcy Code and applicable state laws.

## FACTUAL ALLEGATIONS

### A.     Background: The Citigroup Prepays

18.     The wrongdoing of former Enron officers and managers, as well as that of numerous financial institutions, including the Defendants in this case, has now been well documented.  By Order dated April 8, 2002, the Bankruptcy Court directed the United States Trustee for the Southern District of New York (the "U.S. Trustee") to appoint an examiner for Enron (the "Enron Examiner").  That Order gave the Enron Examiner broad authority to investigate and report on transactions at Enron involving special purpose entities.  On May 22, 2002, the U.S. Trustee appointed Neal Batson as the Enron Examiner.  Since his appointment, the Enron Examiner has reviewed over four million pages of documents, has taken sworn testimony from over 100 witnesses,

and has issued four extensive reports on the SPE transactions and the prepay transactions described herein.

19.     The Examiner found that during the relevant period, Citibank completed eleven prepay transactions with Enron, each of which employed a structure designed to disguise a loan to look like a commodity transaction (the "Citigroup Prepays").

20.     Citibank structured all of the Citigroup Prepays, provided the transaction support, the shell trading partner and/or a portion of the funds necessary to aid and abet the Insiders in publicly reporting the proceeds from these disguised loans as income from commodity trading activities.  The eleven Citigroup Prepays are:

| Name | Closing Date | Amount Financed |
|------|-------------|-----------------|
| Roosevelt | 12/30/98 | $500 million |
| Truman | 6/29/99 | $500 million |
| Jethro | 6/29/99 | $675 million |
| Yosemite I | 11/18/99 | $825 million |
| Nixon | 12/14/99 | $324 million |
| Yosemite II | 2/23/00 | $358 million |
| Yosemite III | 8 /25/00 | $550 million |
| Yosemite IV USD | 5/24/01 | $550 million |
| Yosemite IV GBP | 5/24/01 | £139 million(≈$197.2 million) |
| Yosemite IV Euro | 5/24/01 | €222.5 million(≈$190.6 million) |
| June 2001 | 6/28/01 | $250 million |

**Total ≈$4.9203 billion**

21.     Five of the eleven Citigroup Prepays were completed as a fiscal quarter or year was coming to a close at Enron.  This was not coincidental.  All of the Citigroup Prepays were arranged for the purpose of inflating Enron's operating cash flow so that targeted financial results important to rating agencies and/or industry analysts would be met or exceeded.  In some cases, the Insiders also used the proceeds from the Citigroup Prepays to pay off existing indebtedness thus further manipulating Enron's balance sheet and the rating agency credit ratios based thereon.

22.    In each Citigroup Prepay, the prepaid amount was set by the Insiders to enable Enron falsely to maintain or exceed credit ratios or their vital components. The prepaid amount was in no way determined by a quantity of oil or gas that either Enron wanted to sell or Citigroup/Citibank wanted to buy. As the SEC found, "the amount of the commodity subject to a prepay was based on the amount Enron wanted to borrow. That amount was determined by taking the principal amount required by Enron, adding interest for the number of days the transaction was to last, and dividing that sum by the per-unit price of the referenced commodity." In re Citigroup, Administrative Proceeding 3-11192, Order Instituting a Public Administrative Proceeding Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order and Other Relief, July 28, 2003 at 12.

23.    Each of the Citigroup Prepays thus was structured by Citigroup to give the appearance of a commodity transaction but each was in substance a loan from Citibank to Enron. Although the basic transaction structure varied somewhat over the course of the Citigroup Prepays, in each case the commodity price risk moved through counter parties to the transaction and back to Enron in a circle, so that the risk that the price of the underlying commodity might change was eliminated. At the closing date of each prepay transaction, the substantively identical commodity swap agreements executed by the parties eliminated the effect of any potential change in commodity prices and, through the conduit entity, Enron repaid to Citibank the prepaid amount (the principal) plus a specified rate of interest.

24.    As described fully in the Examiner's Third Report, Citigroup knew the prepays were in substance loans to Enron and, as such, should have been recorded on Enron's financial statements as loans – not commodity trades. Citigroup internal

documents (1) describe the Roosevelt prepay as "effectively a commodity denominated corporate obligation"; (2) state candidly that in the Truman prepay, "we were basically making a loan to [Enron]"; and (3) generally summarize Citigroup's prepay transactions with Enron as "oil goes in a circle so they all cancel…net economically like a loan,"; and "Enron's total volume of prepays….represents essentially another layer of corporate debt in addition to debt accounted as such." After reviewing a prepay transaction, one Citigroup employee pointedly asked: "[G]iven that the flows on the prepaid oil swap, caps and floor all net down to the $475mm payment at a maturity and a coupon a 7.47%, was there a reason not to simply structure it as a loan or note?" When another Citigroup employee foolishly asked about the price of the commodity involved in the disguised loans, the comment back was "since this is all a circle, why does it matter?"

25. Citigroup substantially assisted the Insiders' scheme to manipulate Enron's financial statements with full knowledge:

- that the Citigroup Prepays were loans disguised to look like commodity trades,

- that their purpose was to allow the Insiders to improperly account for the prepaid amounts as cash flow from operations and the obligation to repay the prepaid amounts as price risk management liabilities,

- that in fact the Insiders were improperly accounting for the Citigroup Prepays, and

- that the Insiders were using the prepays to misstate Enron's financial condition to mislead the rating agencies and others into believing that Enron's financial condition was better than it was.

26. As previously noted, the harm caused by the prepay scheme and Citigroup's participation with regard thereto are the subject of the Financial Institution Adversary. This action, on the other hand, addresses the acceleration of the repayment

of the June 2001 Prepay – an acceleration that Citigroup sought to accomplish only 20 days prior to the Petition Date to unjustly enrich itself at the expense of the estate and other creditors of the Debtor Plaintiffs.

**B.  The June 2001 Prepay**

27.     The June 2001 Prepay was structured to resemble a 180-day financially settled prepayment swap transaction for natural gas involving Enron, ENA, Citibank, and Delta Energy Corporation ("Delta").  The prepayment structure was effectuated by the use of a circular series of financially settled natural gas swaps, consisting of three swap transactions between ENA, Citibank and Delta.

28.     In the first step of the transaction, ENA entered into a swap transaction confirmation with Citibank on June 28, 2001 (the "ENA/Citibank Swap"), under which ENA agreed to pay Citibank a fixed payment equal to approximately $255,598,027 on December 28, 2001 (the "Final Payment").  In exchange, Citibank agreed to pay ENA a floating payment on December 28, 2001, equal to the product of (i) the Notional Quantity Per Calculation Period (61,652,281 MMBtu) and (ii) the settlement price on December 27, 2001 of the NYMEX Henry Hub Natural Gas Futures Contract for the January 2002 delivery month (the "Floating Payment"), which ultimately equaled approximately $250,000,000.  Enron guaranteed all obligations of ENA to Citibank under the ENA/Citibank Swap pursuant to a Guaranty dated June 28, 2001, entered into by Enron in favor of Citibank (the "Citibank Guaranty").

29.     In the second step of the transaction, Citibank entered into a similar swap transaction confirmation with Delta on June 28, 2001 (the "Citibank/Delta Swap"), under which (i) Citibank agreed to pay Delta a fixed payment equal to $0.00, and (ii) Delta agreed to pay Citibank the Floating Payment, with all payments to occur on December 28, 2001.  However, unlike the ENA/Citibank Swap, the Citibank/Delta

Swap required Citibank to facilitate an upfront payment to Delta on June 28, 2001, equal to approximately $249,500,000.

30.     The third step of the transaction was completed by Delta entering into a swap transaction confirmation with ENA on June 28, 2001 (the "Delta/ENA Swap"), which was virtually identical to the Citibank/Delta Swap, pursuant to which (i) Delta agreed to pay ENA a fixed payment equal to $0.00 on December 28, 2001, (ii) ENA agreed to pay Delta the Floating Payment on December 28, 2001, and (iii) Delta made an upfront payment to ENA on June 28, 2001, equal to approximately $249,500,000. As with the ENA/Citibank Swap, Enron guaranteed all obligations of ENA to Delta under the Delta/ENA Swap pursuant to a Guaranty dated June 28, 2001, entered into by Enron in favor of Delta (the "Delta Guaranty").

31.     The net effect of these circular transactions is that on June 28, 2001, ENA received a $249,500,000 prepayment from Citibank through its affiliated entity and alter ego, Delta. On December 28, 2001, ENA would pay directly to Citibank the Final Payment of $255,598,027, which would consist of the original payment from Citibank in the amount of $249,500,000, plus an additional agreed upon amount for use of the funds (i.e. interest).

32.     In economic substance, Citibank had made a loan to ENA that ENA was to repay with interest. The commodities price risk was effectively eliminated as a result of the circular nature of the structure and the only remaining risk in the transactions was the risk that ENA would not be able to make the fixed payment. The risk of nonpayment by ENA to Citibank was reduced by the Citibank Guaranty and the Delta Guaranty. The net effect - - a disguised quarter billion dollar loan intended by the Defendants and the Insiders to mask Enron's indebtedness.

C.      **Acceleration of Repayment of the June 2001 Prepay**

33.     Shortly after this June 20001 Prepay closed, however, the Insiders' schemes began to unravel.  In August, 2001 Jeffrey Skilling, Enron's Chief Executive Officer, abruptly resigned.  In response, Enron employee Sherron Watkins wrote her infamous letter to Kenneth Lay, Enron's Chairman, advising of the potential that the Insider's accounting shenanigans would be discovered.   Shortly thereafter, Enron initiated an internal investigation to address these matters.

34.     In September 2001, Enron approached Citigroup again to provide quarter end support through another prepay transaction.  This time, however, Citigroup declined because an additional prepay would have increased Citigroup's unsecured Enron exposure to more than one billion dollars.

35.     On October 16, 2001, Enron announced that it would take an "after-tax non-recurring charge" of $1.01 billion in the third quarter of that year and triggered the public wave of concern and scrutiny of Enron's operations.

36.     Just over a week later, on or about October 24, 2001, Andrew Fastow, Enron's Chief Financial Officer and an Insider who was at the core of the scheme to manipulate Enron's financial condition, was terminated.  On October 28, 2001 the Enron Board established the Powers Committee, the special committee of the Board, to investigate the financial dealings of the Insiders.

37.     These events raised numerous red flags for Citigroup.  In this environment of extreme public scrutiny and with rumors of Enron's imminent bankruptcy filing, the Defendants  orchestrated the Prepay Takeout Transaction.

D.      **The Prepay Takeout Transaction**

38.     By early November 2001, Enron recognized the need to increase its short-term liquidity through a substantial borrowing.  Citibank designed the Prepay

Takeout Transaction to accomplish that borrowing and (i) to convert a $250 million prepetition unsecured obligation into a secured obligation and thereby decrease Citigroup's exposure in the impending Enron bankruptcy; (ii) to mask the transfer so as to avoid the otherwise obvious preferential transfers by running the transaction through two subsidiary entities that were intended to be made bankruptcy remote at Citigroup's insistence; and (iii) to provide a modicum of short term liquidity to delay any bankruptcy filing of the Debtors at least beyond the 90 day preference look back period.

39.     At bottom and as an overview, the Prepay Takeout Transaction purportedly permitted Enron to borrow one billion dollars in new secured financings – with $400 million provided by JP Morgan Chase and $600 million provided by Citigroup. In fact, however, Citigroup provided only $350 million in new money – while using the balance of the funds to convert the $250 million unsecured June 2001 Prepay to a $250 million secured obligation. Citigroup accomplished that objective through the circuitous steps described below.

40.     On November 13, 2001, Transwestern Pipeline Company, a Delaware corporation and indirect wholly owned subsidiary of Enron and ETSC ("Transwestern"), as borrower, entered into a Credit Agreement with the lenders named therein, CNAI and JPMorgan Chase Bank (the "Pipeline Lenders"), as co-administrative Agents, CNAI, as paying agent, and JPMorgan Chase Bank, as collateral trustee (the "Transwestern Credit Agreement"), and on November 19, 2001, Northern Natural Gas Company, a Delaware corporation and then an indirectly wholly owned subsidiary of Enron and ETSC ("NNG", and collectively with Transwestern, the "Pipelines"), as borrower, entered into a Credit Agreement with the lenders named therein, CUSA and JPMorgan Chase Bank, as co-administrative Agents, CUSA, as

paying agent, and JPMorgan Chase Bank, as collateral trustee (the "NNG Credit Agreement," together with the Transwestern Credit Agreement, the "Credit Agreements").

41.     In connection with the Credit Agreements, pursuant to (i) a certain Amendment, Modification, Assignment and Assumption Agreement dated as of November 13, 2001, by and among Delta, CNAI, CUSA, ENA, Enron, and Citibank, (ii) a certain Amendment and Modification Agreement dated as of November 12, 2001, by and between Delta and Citibank, and (iii) the other assignment documents set forth below, the following actions were effectuated:

A.     <u>Cancellation of Floating Payments</u>.  Simultaneously, ENA, Delta and Citibank cancelled the Floating Payments payable on December 28, 2001 under the ENA/Citibank Swap, the Citibank/Delta Swap, and the Delta/ENA Swap components of the June 2001 Prepay.

B.     <u>Cancellation of Final Payment</u>.  Citibank and ENA cancelled the Final Payment of $255,598,027 payable in December by ENA to Citibank in return for ENA's agreement to pay to Citibank the following amounts, which total $254,617,654 (the prorated sum of the Final Payment), plus certain increases if the payments were not  made on the relevant funding dates (collectively, the "Termination Payments"):

(i)     $137,500,000 on the initial funding date set forth in the Transwestern Credit Agreement;

(ii)     $112,500,000 on the initial funding date set forth in the NNG Credit Agreement;

(iii)     $2,664,979 on the initial funding date set forth in the Transwestern Credit Agreement, and

(iv)    $1,952,675 on the initial funding date set forth in the NNG Credit Agreement.

C.    <u>Assignments by Citibank to CNAI and CUSA</u>.  Citibank assigned to (i) CNAI the $137,500,000 payment rights set forth in subparagraph B (i) above, and (ii) CUSA the $112,500,000 payment rights set forth in subparagraph B (ii) above.

D.    <u>Assignment by ENA to Enron</u>.  In consideration of a full and complete extinguishment of intercompany liability owed by Enron to ENA in an amount equal to the Termination Payments, Enron assumed the Termination Payments of ENA and Citibank released ENA from any liability arising from the Termination Payments.

E.    <u>Cancellation of the Guaranties</u>.  Citibank and Delta (i) acknowledged that all obligations of ENA were fully satisfied and discharged, (ii) cancelled and terminated the Citibank Guaranty and the Delta Guaranty, and (iii) discharged and released Enron from any liability under the Citibank Guaranty and the Delta Guaranty.

F.    <u>Assignment by Enron to Transwestern</u>.  As required by the Transwestern Credit Agreement, CNAI, Enron, and Transwestern then entered into a certain Transwestern Assignment and Assumption Agreement dated as of November 13, 2001 (the "Transwestern Assignment"), whereby Enron assigned and Transwestern assumed the $137,500,000 payment obligation assumed by Enron under paragraph D. above.  In exchange for the Transwestern Assignment, Enron contemporaneously delivered a Subordinated Promissory Note, dated November 13, 2001, in favor of Transwestern and CNAI agreed to

release and discharge Enron from any further liability with respect to the $137,500,000 payment obligation.

G. <u>Assignment by Enron to NNG</u>. As required by the NNG Credit Agreement, CUSA, Enron, and NNG then entered into a certain NNG Assignment and Assumption Agreement dated as of November 19, 2001 (the "NNG Assignment"), whereby Enron assigned and Transwestern assumed the $112,500,000 payment obligation assumed by Enron under paragraph D. above. In exchange for the NNG Assignment, Enron contemporaneously delivered a Subordinated Promissory Note, dated November 19, 2001, in favor of NNG and CUSA agreed to release and discharge Enron from any further liability with respect to the $112,500,000 payment obligation.

42. Pursuant to the Credit Agreements and other assignment documents described above, the Enron subsidiaries and NNG, assumed the Final Payment obligations under the June 2001 Prepay and ENA, Delta, Citibank and Enron released each party from their respective obligations thereunder and the June 2001 Prepay was thereby terminated.

43. Further, on November 13, 2001, Transwestern executed a certain Security Agreement, pursuant to which it granted CNAI, as Paying Agent under the Transwestern Credit Agreement, a security interest in each and every contract, receivable and general intangible, all inventory, equipment, investment property, fixtures, cash and the proceeds of all of the foregoing, including the Subordinated Promissory Note in the sum of $137,500,000 delivered by Enron to Transwestern, among other things, as security for the $550 million obligation incurred under the Transwestern Credit Agreement.

44.     In addition, on November 13, 2001, Enron caused Transwestern Holding Company, Inc. ("Transwestern Holding") to execute a certain Stock Pledge Agreement pursuant to which Transwestern Holding pledged its interest in all capital stock of Transwestern as additional security in connection with the Transwestern Credit Agreement.

45.     Further, on November 19, 2001, NNG executed a certain Security Agreement, pursuant to which it granted JPMorgan Chase Bank, as Collateral Agent, under the NNG Credit Agreement a security interest in each and every contract, receivable and general intangible and the proceeds of all of the foregoing, including the Subordinated Promissory Note in the sum of $112,500,000 delivered by Enron to NNG, among other things, as security for the $450 million obligation incurred under the NNG Credit Agreement.

46.     In addition, on November 19, 2001, Enron caused NNGC Holding Company, Inc. ("NNGC Holding", collectively with Transwestern Holding the "Pipeline Holding Companies") to execute a certain Stock Pledge Agreement pursuant to which NNGC Holding pledged its interest in all capital stock of NNG as additional security in connection with the NNG Credit Agreement.

47.     The value of property and pledges provided as security by Transwestern, NNG, and the Pipeline Holding Companies, greatly exceeded the amounts financed.

48.     As still additional collateral, Enron executed a Guaranty Agreement in connection with both Credit Agreements pursuant to which it guaranteed the respective obligations of Transwestern and NNG under the Credit Agreements in an amount totaling $1 billion.

49. In connection with the Prepay Takeout Transaction, Enron thus incurred significant new obligations and caused various direct and indirect wholly owned subsidiaries to transfer valuable interests in property to or for the benefit of Citigroup and thereby diminished the value of Debtor Plaintiffs' estates.

50. Further, pursuant to the Credit Agreements, the Termination Payment was structured to be a separate transaction from the financing provided by JP Morgan Chase. CNAI and CUSA "loaned" the funds under this aspect of the transaction, and the funds "loaned" to Transwestern and NNG were only "deemed" to have been funded by CNAI and CUSA, in their respective shares. In fact, no funds were loaned. Thus, the Termination Payment was "converted" to a secured obligation of the Pipelines.

51. As a result of the foregoing, Enron borrowed $137,500,000 from Transwestern and $112,500,000 from NNG, as documented by the subordinated notes entered in conjunction therewith. But having agreed to enter those notes, Enron directed that the proceeds of that borrowing be used by Transwestern and NNG to pay Enron's prep-petition debt (the "Termination Payment") owed Citigroup and which Transwestern and NNG were now to satisfy. Transwestern and NNG complied with that direction by permitting their respective shares of the Citigroup borrowing in the amount of $600 million to be reduced by $250 million and to have that amount instead be "deemed" to have been provided in satisfaction of the Termination Payment. This use of the values borrowed from its subsidiaries constituted a preferential payment to Citigroup.

52. Despite ENA's purported assignment of the Termination Payment to Enron and Enron's assignment of said obligations to Transwestern and NNG in their respective shares, on November 19, 2001, ENA wired the sum of $2,664,979.00 directly

to Citibank and on November 21, 2001, ENA wired the sum of $1,993,973.00 directly to Citibank (the "Wire Transfers") in satisfaction of a portion of the Final Payment. The Wire Transfers constituted payment of that component of the Final Payment that represents the interest component of the disguised loan of $250 million through the June 2001 Prepay.

**E.    Citigroup's Bad Faith**

53.    At the time of undertaking the Prepay Takeout Transaction, Citigroup understood and appreciated that the risk of a near term Enron bankruptcy was substantial. By early November 2001, Citigroup recognized that there would be a significant cash shortfall associated with Enron's ability to pay its debts as they came due. Because of Enron's lack of access to capital markets, Citigroup further recognized that Enron's corporate credit rating would likely be downgraded to below investment grade. And Citigroup understood well that Enron had at least two significant structured finance transactions (Marlin and Osprey) that were tied to Enron's credit rating which would trigger Enron's obligation to repay approximately $5.3 billion of debt upon the downgrading of Enron's credit rating below investment grade. Consequently, Citigroup understood the high risk that Enron would be out of cash by late November or early December 2001, due to sizable maturity scheduled to become due at the close of the fourth quarter of 2001 -- including the scheduled repayment of the $250 million June 2001 Prepay.

54.    Citigroup, therefore, devised a plan to cut its losses by transforming the unsecured June 2001 Prepay into a secured financing so as to strengthen Citigroup's hand in the coming bankruptcy at the expense of the Debtors' estates and all other unsecured creditors. Citigroup designed the Prepay Takeout Transaction not simply to provide $350 million of new money from Citigroup to Enron

and its affiliates, but instead to roll the $250 million unsecured obligation of ENA into the secured pipeline credit facilities pro rata. This intent to collateralize the pre-petition debt, was Citigroup's explicit purpose. Moreover, Citigroup explicitly recognized that if bankruptcy were to occur in the 90 day period post-transaction, the repayment of the June 2001 Prepay would be treated as a recoverable preference.

55.     Based upon the foregoing, within one year of the Petition Date, the Plaintiffs Debtors  transferred valuable interests in property and incurred obligations with actual intent to hinder, delay or defraud entities to which Enron was or became indebted at the time the transfers were made and the obligations were incurred or otherwise received less than reasonably equivalent value in exchange for such transfers.

### COUNT I
**(Avoidance of the Citi Preferential Transfers)**

56.     The preceding paragraphs are realleged and incorporated by reference.

57.     In the weeks prior to Enron's bankruptcy filing, Citigroup required that the Debtor Plaintiffs make or cause to be made the following transfers or incur or caused to be incurred the following obligations:

> (i)     Enron assumed the Final Payment obligation of ENA to Citibank;
>
> (ii)    Enron and ETSC caused Transwestern to assume 55% of the Termination Payment obligation (i.e., $137,500,000) and NNG to assume 45% of the Termination Payment obligation (i.e., $112,500,000);
>
> (iii)   Enron delivered a subordinated promissory note to Transwestern in the sum of $137,500,000 and a subordinated promissory note to NNG in the sum of $112,500,000;

(iv)     Enron also guaranteed the payment of the $1 billion obligations incurred by Transwestern and NNG pursuant to the Credit Agreements;

(v)      ETSC transferred all of the capital stock of Transwestern to Transwestern Holding Company, Inc. ("TW Holding"), a bankruptcy remote entity incorporated at the insistence of Citigroup;

(vi)     Enron and ETSC caused TW Holding to transfer approximately 20% of the capital shares of Transwestern to Wilmington Trust Company, as Voting Trustee, that was prohibited from voting to authorize a voluntary bankruptcy filing by Transwestern pursuant to a certain Voting Trust Agreement;

(vii)    Enron and ETSC caused TW Holding to immediately pledge all of the capital stock of Transwestern to the Pipeline Lenders;

(viii)   Enron and ETSC caused Transwestern to amend its Certificate of Incorporation to require a super majority in excess of 80% of its voting stock to approve a voluntary bankruptcy filing, among other things;

(ix)     ETSC caused MCTJ to transfer all of the capital stock of NNGC Holding Company, Inc. ("NNGC"), a bankruptcy remote entity to incorporated at the insistence of Citigroup;

(x)      Enron and ETSC caused NNGC to pledge all of the capital stock of NNG to the Pipeline Lenders;

(xi) Enron and ETSC caused NNGC to transfer approximately 20% of the capital shares of NNG to Wilmington Trust Company, as Voting Trustee, who was prohibited from voting to authorize a voluntary bankruptcy filing by NNG pursuant to a certain Voting Trust Agreement; and

(xii) Enron and ETSC caused NNG to amend its Certificate of Incorporation to require a super majority in excess of 80% of its voting stock to approve a voluntary bankruptcy filing, among other things.

58.    Within ninety (90) days prior to the Petition Date, Enron, ENA ETSC, directly or through a conduit, made the transfers identified in the following table, or caused them to be made, to or for the benefit of the identified transferees on or about the dates specified below:

| TRANSFEROR | OBLIGOR | INITIAL TRANSFEREE or BENEFICIARY | SUBSEQUENT TRANSFEREES | INITIAL TRANSFER DATE | TRANSFER AMOUNT |
|---|---|---|---|---|---|
| ENA | ENA | Citibank | | 11/21/2001 | $1,993,973.00 |
| ENA | ENA | Citibank | | 11/19/2001 | $2,664,979.00 |
| Enron or ETSC | ENA and/or Enron | CNAI | Citibank | 11/13/2001 | $137,500,000.00 |
| Enron or ETSC | ENA and/or Enron | CUSA | Citibank | 11/21/2001 | $112,500,000.00 |

59.    The transfers identified in the foregoing table, together with any interest, fees, and other payments to or for the benefit of Citigroup related to the Prepay Takeout Transaction, are referred to herein as the "Preferential Transfers."

60.    The Preferential Transfers constitute transfers of interests in property of Enron, ENA and/or ETSC.

61.     Each of the Preferential Transfers was made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

62.     Each of the Preferential Transfers was made to or for the benefit of a creditor for or on account of an antecedent debt owed by Enron and/or ENA and/or ETSC before the transfer was made.

63.     At the time each of the Preferential Transfers was made, Enron, ENA and, upon information and belief, ETSC were insolvent for purposes of section 547(b) of the Bankruptcy Code.

64.     Each of the Preferential Transfers enabled the transferees to receive more than they would have received if the case were a case under chapter 7 of the Bankruptcy Code, the transfer had not been made, and the transferees received payment of their debt to the extent provided by the Bankruptcy Code.

65.     The Preferential Transfers are avoidable as preferences under section 547(b) of the Bankruptcy Code.

## COUNT II
**(Avoidance of Intentional Fraudulent Transfers
Under Section 548(a)(1)(A) of the Bankruptcy Code)**

66.     The preceding paragraphs are realleged and incorporated by reference.

67.     Enron and ETSC (i) transferred the equivalent of $250 million through the roll up of the unsecured June 2001 Prepay into the secured Prepay Takeout Transaction;  (ii) impaired the value of their equity interest in the pipeline companies by encumbering the assets with a $1 billion of new security interests;  and (iii) incurred obligations the equivalent of $1 billion in the form of the Credit Agreement guarantees (the "Prepay Fraudulent Transfers").

68.     Each Prepay Fraudulent Transfer was made with actual intent to hinder, delay or defraud one or more entities to which the Debtor Plaintiffs were or became, on or after the date such transfers were made or such obligations were incurred, indebted.

69.     Each Prepay Fraudulent Transfer is avoidable under section 548(a)(1)(A) of the Bankruptcy Code.

### COUNT III
**(Avoidance of Intentional Fraudulent Transfers
Under Section 544 of the Bankruptcy Code)**

70.     The preceding paragraphs are realleged and incorporated by reference.

71.     Each Prepay Fraudulent Transfer was made with actual intent to hinder, delay or defraud one or more entities to which Plaintiff was or became, on or after the date such transfers were made or such obligations were incurred, indebted.

72.     Each Prepay Fraudulent Transfer is avoidable under section 544 of the Bankruptcy Code and applicable nonbankruptcy law.

### COUNT IV
**(Avoidance of Constructively Fraudulent Transfers
Under Section 548(a)(1)(B) of the Bankruptcy Code)**

73.     The preceding paragraphs are realleged and incorporated by reference.

74.     Enron and in certain cases ETSC received less than a reasonably equivalent value from the transferee in exchange for the Prepay Fraudulent Transfers.

75.     When the Prepay Fraudulent Transfers were made, Enron and, upon and information and belief, ETSC were insolvent, or became insolvent as a result of the transfers;  were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was unreasonably small

capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

76. The Prepay Fraudulent Transfers are avoidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

<u>**COUNT V**</u>
**(Recovery of Avoidable Transfers)**

77. The preceding paragraphs are realleged and incorporated by reference.

78. To the extent that the Preferential Transfers, Intentional Fraudulent Transfers and Intentional Fraudulent Conveyances are avoidable under Bankruptcy Code sections 544, 547 or 548, then, pursuant to section 550 of the Bankruptcy Code, the Plaintiffs may recover from Citigroup, or from any immediate or mediate transferee of Citigroup, the property transferred, or the value of such property, for the benefit of the Debtors' respective bankruptcy estates.

<u>**COUNT VI**</u>
**(Disallowance of Claims Under Bankruptcy Code Section 502(d))**

79. The preceding paragraphs are realleged and incorporated by reference.

80. By reason of the foregoing facts and pursuant to Bankruptcy Code section 502(d), the claims of Citigroup must be disallowed unless and until it has turned over to Plaintiff the property transferred, or paid Plaintiffs the value of such property, for which it is liable under Bankruptcy Code section 550.

## COUNT VII
### (Equitable Subordination Under Section 510(c)(1)
### and 105(a) of the Bankruptcy Code)

81.     The preceding paragraphs are realleged and incorporated by reference.

82.     Citigroup filed various proofs of claim against the Debtors estates.

83.     Citigroup engaged in inequitable conduct, including the conduct described herein, that has resulted in injury to creditors or the conferring of an unfair advantage on Citigroup.  This inequitable conduct has resulted in harm to the Debtors' bankruptcy estates and to its entire creditor body, in that general unsecured creditors have been induced to extend credit without knowledge of the actual facts regarding the respective Debtor plaintiffs' financial condition, and general unsecured creditors are less likely to recover the full amounts due them because of the conduct of Citigroup.

84.     Under principles of equitable subordination, all claims asserted against the Debtors by, or on behalf of, or for the benefit of Citigroup or its affiliated entities, should be subordinated for purposes of distribution, pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code.

85.     Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

## COUNT VIII
### (Unjust Enrichment)

86.     The preceding paragraphs are realleged and incorporated by reference.

87.     Through the Prepay Takeout Transaction, Defendants received lien and security interests in the assets of Debtor Plaintiffs' wholly owned subsidiaries, thereby diminishing the value of the assets of Debtor Plaintiffs' estates and the values which would otherwise have been available to other unsecured creditors.  Defendants

26

further caused the Debtor Plaintiffs to incur new guaranty and other obligations and transfer or pledge stock and controlling interests in a variety of valuable assets. In so doing, the Defendants unjustly enriched themselves at the expense of the Debtor Plaintiffs' estates and creditors. The Defendants did so with the expectation that a bankruptcy of the Debtors was imminent and the knowledge and intent that their financial manipulations would avoid the bankruptcy priority scheme by transforming Citigroup's unsecured $250 million June 2001 Prepay claim to a secured claim with priority over other unsecured creditors.

88.     As set forth above, Defendants were unjustly and grossly enriched and received money to which they were not entitled, and which the Debtor Plaintiffs and their affiliates should not have been required to pay.

89.     In equity and good conscience, each of the Defendants should be required to return the value derived from the schemes alleged above – including the return of the $250 million.

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in its favor as follows:

(i)     For an order avoiding and setting aside the transfers and obligations identified in Counts I through IV;

(ii)    For an order directing each respective transferee of the transfers to return the property transferred or the value of such property to the Debtors' bankruptcy estates;

(iii)   For an order disallowing any and all claims of the Defendants unless or until such Defendant has turned over to Plaintiff the property transferred, or paid the Debtors'

bankruptcy estate the value of such property, for which it is liable under section 550 of the Bankruptcy Code;

(iv)    For an order equitably subordinating all claims of the Defendants asserted against the Plaintiffs, or other affiliated Debtors in the related bankruptcy proceedings;  and

**[concluded on the following page]**

      (v)    For damages and disgorgement of amounts to be proven at trial, but in no event less than $250 million.

DATED:  New York, New York
           December 1, 2003

                          ENRON CORP, ENRON NORTH AMERICA
                          CORP. and ENRON TRANSPORTATION
                          SERVICES COMPANY,
                          Debtors in Possession and Plaintiffs,
                          By their Bankruptcy Co-Counsel,
                          TOGUT, SEGAL & SEGAL LLP,
                          By:

                          /s/ Scott E. Ratner
                          ALBERT TOGUT (AT-9759)
                          FRANK A. OSWALD (FAO-1223)
                          SCOTT E. RATNER (SER-0015)
                          Members of the Firm
                          One Penn Plaza, Suite 3335
                          New York, New York 10119
                          (212) 594-5000

DATED:  Cleveland, Ohio
           December 1, 2003

                          OFFICIAL COMMITTEE OF UNSECURED
                            CREDITORS of ENRON CORP, *et al*
                          By its Attorneys,
                          SQUIRE, SANDERS & DEMPSEY LLP,
                          By:

                          /s/ Howard J. C. Nicols
                          HOWARD J. C. NICOLS (HN-3594)
                          4900 Key Tower
                          127 Public Square
                          Cleveland, OH  44114 – 1304
                          (216) 479-8500

                              and

                          312 Walnut Street, Suite 3500
                          Cincinnati, Ohio 45202-4036
                          (513) 361-1200
                          Stephen D. Lerner (SL-7598)