TOGUT, SEGAL & SEGAL LLP
Bankruptcy Co-Counsel for Enron Corp, *et al.*,
Reorganized Debtors
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald (FAO-1223)
Howard P. Magaliff (HPM-2189)

SQUIRE, SANDERS & DEMPSEY L.L.P.
Counsel for the Official Committee of
Unsecured Creditors of Enron Corp, *et al.*,
312 Walnut Street, Suite 3500
Cincinnati, Ohio 45202-4036
(513) 361-1200
Stephen D. Lerner (SL-7598)
        and
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114-1304
(216) 479-8500
Howard J. C. Nicols (HN-3594)
Patrick J. Brooks (PB-8065)
        and
600 Travis, Suite 6250
Houston, Texas 77002-3000
(713) 546-5850
Steven B. Harris (SH-0531)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re:                                               :        Chapter 11
                                                     :        Case No. 01-16034 (AJG)
ENRON CORP., *et al.*,                               :        (Post-confirmation)
                                                     :
                        Reorganized Debtors.         :        Jointly Administered

-------------------------------------------------------------x

ENRON CORP., ENRON NORTH AMERICA          :        Adversary Proceeding
CORP., ENRON TRANSPORTATION               :        No. 03-93611 (AJG)
SERVICES COMPANY and THE OFFICIAL         :
COMMITTEE OF UNSECURED CREDITORS          :
OF ENRON *et al.*,                        :
                                          :
                        Plaintiffs,       :
                                          :
        v.                                :
                                          :
CITIGROUP, INC., CITIBANK N.A.,           :
CITICORP NORTH AMERICA, INC. and          :
CITICORP USA, INC.,                       :
                                          :
                        Defendants.       :

-------------------------------------------------------------x

**JOINT SECOND AMENDED COMPLAINT OF THE
REORGANIZED DEBTORS AND OFFICIAL COMMITTEE OF
UNSECURED CREDITORS FOR THE AVOIDANCE AND RECOVERY
OF PREFERENTIAL AND FRAUDULENT TRANSFERS, DISALLOWANCE
OF CLAIMS, EQUITABLE SUBORDINATION AND DECLARATORY RELIEF**

Enron Corp., Enron North America Corp. and Enron Transportation Serv-
ices Company, as reorganized debtors, (the "Debtor Plaintiffs") and the Official Com-
mittee of Unsecured Creditors of Enron Corp. *et al.* (the "Committee") (collectively the
"Plaintiffs"), for their Complaint, jointly allege the following upon knowledge as to
themselves and their own acts and otherwise upon information and belief:

## NATURE OF THIS ACTION

1.      On September 24, 2003, Enron Corp. ("Enron") and Enron North
America Corp. ("ENA"), among other affiliated reorganized debtors, sued certain of the
Defendants, in addition to numerous other financial institutions, that bear substantial
responsibility for the spectacular collapse of what once was the seventh largest corpora-
tion in the United States.  That case was assigned Adversary Proceeding No. 03-09266
and currently is pending before this Court (the "Financial Institution Adversary").

2.      The Financial Institution Adversary seeks relief against various fi-
nancial institutions that participated with a small group of former senior officers and
managers of Enron (the "Insiders") in a multi-year scheme to manipulate and misstate
Enron's financial condition.  The primary purposes of this scheme were: (i) to mask a
growing disparity between the company's reported revenues, which were increasingly
based upon mark-to-market accounting valuations, and its "real" earnings from opera-
tions and (ii) to conceal the mountain of debt required to float the company's varied and
often unsuccessful business ventures.

3.      The financial institutions helped perpetuate the scheme by design-
ing, implementing, and often financing various structured finance transactions with

knowledge that the Insiders were improperly recording the financial effects of these transactions. For example, financial institutions, including Citibank, made loans to Enron but deliberately disguised these loans as prepay commodity contracts and swaps. These transactions purport to purchase and sell commodities when in fact the transactions were structured to be circular – often with no commodity being transferred at all. These "prepay" transactions routinely closed at the end of a fiscal quarter and were arranged in amounts specifically chosen to inflate Enron's operating cash flow to levels necessary to maintain Enron's credit ratings. The billions of dollars received by Enron from the "prepay" transactions were wrongly recorded as cash flow from Enron's business operations, giving the false appearance that Enron's businesses were healthy while disguising and deepening Enron's insolvency. The damage caused by this overarching scheme is addressed in the Financial Institution Adversary.

4.     This adversary proceeding, on the other hand, addresses a discrete transaction (the "Prepay Takeout Transaction") that was consummated to terminate one of those prepays. At bottom, and on the eve of bankruptcy, the Defendants used the Prepay Takeout Transaction to convert $250 million in unsecured prepetition obligations owed by ENA to Citibank into a secured $250 million dollar obligation of two of Enron's wholly owned subsidiaries – all of which was accomplished to the detriment of the Debtor Plaintiffs' estates and for the benefit of Citigroup, which dictated the terms of the transaction. The Plaintiffs bring this action to avoid and recover the resulting preferential payments and fraudulent transfers accomplished through the Prepay Takeout Transaction, disallow and subordinate the Defendants' claims against the Debtor Plaintiffs' estates and to prevent the unjust enrichment of Defendants that would otherwise result from these financial machinations. In addition, this is a Complaint for declaratory relief pursuant to 28 U.S.C. § 2201 that certain asserted rights to indemnifica-

3

tion related to the prosecution of this adversary proceeding are invalid or unenforceable in equity and law because those indemnity obligations were fraudulently incurred for the purpose of defeating effective remedies otherwise provided for under the Bankruptcy Code and applicable state law.

5. This adversary proceeding presents unique issues of law because the transaction was structured by the Defendants with the express intent to circumvent the avoidance provisions of the Bankruptcy Code and improve the Defendants' position to the detriment of the Debtor Plaintiffs' creditors. Specifically, rather than have the Pipelines (the Enron subsidiaries described below) simply borrow funds based on the strength of their own credit and loan or dividend those funds to Enron for its corporate purposes (as described below), including termination of the June 2001 Prepay (defined below), the Defendants made the financing contingent upon the agreement of the Pipelines to: (i) enter into a complex transaction pursuant to which the Pipelines ostensibly assumed the unsecured obligations of ENA, by and through Enron, and (ii) agree to secure the repayment of that Prepay Takeout obligation, despite having received no consideration from the Defendants. Further, the Defendants conditioned the Prepay Takeout Transaction on their requirements that: (i) the Pipelines be made "bankruptcy remote" by Enron, and (ii) the Defendants indirectly control the necessary vote for the Pipelines to voluntarily file for relief. All of this was accomplished at the direction of the Defendants, and implemented by Enron with little or no independent input of the Pipelines, in order to generate additional liquidity for Enron, improve market confidence in Enron and defer a bankruptcy filing.

6. As a consequence of the Prepay Takeout Transaction, Enron Transportation Services Company ("ETSC") directly (and Enron indirectly) diminished the value of its equity interests in the wholly-owned Pipelines by encumbering them with

$1 billion in new obligations, including the $250 million Prepay Takeout, in exchange for worthless inter-company notes of Enron. Moreover, with full knowledge that the transaction was structured in an attempt to insure that it would not be subject to avoidance in the likely event of Enron's bankruptcy, the Defendants required the Pipelines to indemnify them from and against any liabilities arising, *inter alia*, from any challenge to the Prepay Takeout Transaction, in order to preserve all the economic benefits of the transaction even if the transaction were avoided or otherwise successfully challenged.

## THE PARTIES

### A. The Plaintiffs

7. Plaintiff Enron is an Oregon corporation with its principal place of business in Houston, Texas. As of this date, Enron is a reorganized debtor in accordance with the Plan, as defined below. Enron today is neither represented by, nor representative of, the Insiders, who contributed to the company's financial collapse. The Insiders have been driven out, and were replaced initially by the outside, independent management of Stephen Forbes Cooper, LLC (headed by restructuring specialist Stephen Cooper). By Order dated April 4, 2002, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") authorized and approved the employment of Stephen Cooper as acting CEO and Chief Restructuring Officer of Enron effective January 28, 2002. The Bankruptcy Court also authorized the assignment of a certain number of Stephen Forbes Cooper, LLC individuals to act as new officers of Enron. Cooper and the new officers were given full authority to manage and operate Enron's business.

8. By order dated July 15, 2004 (the "Confirmation Order"), the Bankruptcy Court confirmed the Supplemental Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan"). The ef-

fective date of the Plan occurred on November 17, 2004. Pursuant to the Confirmation Order, reorganized Enron is managed by a new board of directors and, to the extent provided in the Plan, by a Reorganized Debtor Plan Administrator (Stephen Forbes Cooper LLC) pursuant to the Reorganized Debtor Plan Administration Agreement.

9. Plaintiff ENA is a Delaware corporation with its principal place of business in Houston, Texas. ENA is a reorganized debtor under the Plan. Pursuant to the Confirmation Order, ENA is managed by a new board of directors and, to the extent provided in the Plan, by a Reorganized Debtor Plan Administrator (Stephen Forbes Cooper LLC) pursuant to the Reorganized Debtor Plan Administration Agreement.

10. Plaintiff ETSC is a Delaware corporation with its principal place of business in Houston, Texas. ETSC is a reorganized debtor under the Plan. Pursuant to the Confirmation Order, ETSC is managed by a new board of directors and, to the extent provided in the Plan, by a Reorganized Debtor Plan Administrator (Stephen Forbes Cooper LLC) pursuant to the Reorganized Debtor Plan Administration Agreement.

11. The Committee is the duly appointed official committee of unsecured creditors of the pre-confirmation reorganized debtors in the above-captioned jointly administered bankruptcy case. On December 12, 2001, the U.S. Trustee appointed the Committee. Pursuant to section 33.1 of the Plan the Committee continues in existence for certain limited purposes, including, but not limited to, the prosecution of certain litigation, including this adversary proceeding.

B.    **The Defendants**

12.    Defendant Citigroup Inc. is a Delaware corporation with its principal place of business at 399 Park Avenue, New York, New York 10043.  Citigroup Inc. is a registered bank holding company.

13.    Defendant Citibank, N.A. ("Citibank") is a nationally chartered bank and is Citigroup's principal bank subsidiary with its principal place of business at 399 Park Avenue, New York, New York 10043.  Citigroup Inc. owns and/or controls Citibank.

14.    Defendant Citicorp North America, Inc. ("CNAI") is an individual subsidiary of Citigroup, Inc.  It is a Delaware corporation with its principal place of business at 450 Mamaroneck Avenue, Harrison, New York 10528.

15.    Citicorp USA, Inc. ("CUSA") is a Delaware corporation with its principal place of business at 450 Mamaroneck Avenue, Harrison, New York 10528, and registered agent at CT Corporation System, 111 Eighth Avenue, New York, New York 10011.  Citigroup Inc., Citibank, CNAI and CUSA are collectively referred to herein as "Citigroup" or "Defendants".

**JURISDICTION AND VENUE**

16.    On December 2, 2001 (the "Petition Date"), Enron, ENA and ETSC filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court.

17.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 1334(b) and 1334(e), and section 38.1 of the Plan. Substantially all of the claims alleged herein are core proceedings under 28 U.S.C. §§ 157(b)(2)(B), (C), (F), (H) and (O).  Pursuant to 28 U.S.C. § 157(a) and 157(b)(1) and the general order of reference of the United States District Court for the Southern District of

New York dated July 10, 1984, this Court may exercise subject matter jurisdiction in this case.

18.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1409(a) because this is a proceeding arising under the Bankruptcy Code, or arising in or related to a case under the Bankruptcy Code.

19.    This adversary proceeding is brought in accordance with Federal Rules of Bankruptcy Procedure 7001, *et seq*., and seeks relief under sections 105(a), 502(d), 510(c)(1), 544, 547, 548 and 550 of the Bankruptcy Code, 28 U.S.C. § 2201 and applicable state laws.

## FACTUAL ALLEGATIONS

### A.    Background: The Citigroup Prepays

20.    The wrongdoing of former Enron officers and managers, as well as that of numerous financial institutions, including the Defendants in this case, has now been well documented.  By Order dated April 8, 2002, the Bankruptcy Court directed the United States Trustee for the Southern District of New York (the "U.S. Trustee") to appoint an examiner for Enron (the "Enron Examiner").  That Order gave the Enron Examiner broad authority to investigate and report on transactions at Enron involving special purpose entities.  On May 22, 2002, the U.S. Trustee appointed Neal Batson as the Enron Examiner.  During his tenure, the Enron Examiner reviewed over four million pages of documents, took sworn testimony from over 100 witnesses, and issued four extensive reports on the SPE transactions and the prepay transactions described herein.

21.    The Examiner found that during the relevant period, Citibank completed eleven prepay transactions with Enron, each of which employed a structure designed to disguise a loan to look like a commodity transaction (the "Citigroup Prepays").

22.     Citibank structured all of the Citigroup Prepays, provided the transaction support, the shell trading partner and/or a portion of the funds necessary to aid and abet the Insiders in publicly reporting the proceeds from these disguised loans as income from commodity trading activities.  The eleven Citigroup Prepays are:

| Name | Closing Date | Amount Financed |
|------|-------------|-----------------|
| Roosevelt | 12/30/98 | $500 million |
| Truman | 6/29/99 | $500 million |
| Jethro | 6/29/99 | $675 million |
| Yosemite I | 11/18/99 | $825 million |
| Nixon | 12/14/99 | $324 million |
| Yosemite II | 2/23/00 | $358 million |
| Yosemite III | 8 /25/00 | $550 million |
| Yosemite IV USD | 5/24/01 | $550 million |
| Yosemite IV GBP | 5/24/01 | £139 million(≈$197.2 million) |
| Yosemite IV Euro | 5/24/01 | €222.5 million (≈$190.6 million) |
| June 2001 | 6/28/01 | $250 million |

**Total ≈$4.9203 billion**

23.     Five of the eleven Citigroup Prepays were completed as a fiscal quarter or year was coming to a close at Enron.  This was not coincidental.  All of the Citigroup Prepays were arranged for the purpose of inflating Enron's operating cash flow so that targeted financial results important to rating agencies and/or industry analysts would be met or exceeded.  In some cases, the Insiders also used the proceeds from the Citigroup Prepays to pay off existing indebtedness, thus further manipulating Enron's balance sheet and the rating agency credit ratios based thereon.

24.     In each Citigroup Prepay, the prepaid amount was set by the Insiders to enable Enron falsely to maintain or exceed credit ratios or their vital components. The prepaid amounts were in no way determined by a quantity of oil or gas that either Enron wanted to sell or Citigroup/Citibank wanted to buy.  As the SEC found, "the amount of the commodity subject to a prepay was based on the amount Enron wanted to borrow.  That amount was determined by taking the principal amount required by

Enron, adding interest for the number of days the transaction was to last, and dividing that sum by the per-unit price of the referenced commodity." In re Citigroup, Administrative Proceeding 3-11192, Order Instituting a Public Administrative Proceeding Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order and Other Relief, July 28, 2003 at 12.

25.     Each of the Citigroup Prepays thus was structured by Citigroup to give the appearance of a commodity transaction but each was, in substance, a loan from Citibank to Enron.  Although the basic transaction structure varied somewhat over the course of the Citigroup Prepays, in each case the commodity price risk moved through counter-parties to the transaction and back to Enron in a circle, so that the risk that the price of the underlying commodity might change was eliminated.  At the closing date of each prepay transaction, the substantively identical commodity swap agreements executed by the parties eliminated the effect of any potential change in commodity prices and, through the conduit entity, Enron repaid to Citibank the prepaid amount (the principal) plus a specified rate of interest.

26.     As described fully in the Examiner's Third Report, Citigroup knew the prepays were, in substance, loans to Enron and, as such, should have been recorded on Enron's financial statements as loans – not commodity trades.  Citigroup internal documents (1) describe the Roosevelt prepay as "effectively a commodity denominated corporate obligation";  (2) state candidly that in the Truman prepay, "we were basically making a loan to [Enron]"; and (3) generally summarize Citigroup's prepay transactions with Enron as "oil goes in a circle so they all cancel…net economically like a loan,";  and "Enron's total volume of prepays….represents essentially another layer of corporate debt in addition to debt accounted as such."  After reviewing a prepay transaction, one Citigroup employee pointedly asked:  "[G]iven that the flows on the prepaid oil swap,

caps and floor all net down to the $475mm payment at a maturity and a coupon at 7.47%, was there a reason not to simply structure it as a loan or note?" When another Citigroup employee foolishly asked about the price of the commodity involved in the disguised loans, the comment back was "Since this is all a circle, why does it matter?" *See,* Document CITI-B0069416.

27.     Citigroup substantially assisted the Insiders' scheme to manipulate Enron's financial statements with full knowledge:

- that the Citigroup Prepays were loans disguised to look like commodity trades,

- that their purpose was to allow the Insiders to improperly account for the prepaid amounts as cash flow from operations and the obligation to repay the prepaid amounts as price risk management liabilities,

- that in fact the Insiders were improperly accounting for the Citigroup Prepays, and

- that the Insiders were using the prepays to misstate Enron's financial condition to mislead the rating agencies and others into believing that Enron's financial condition was better than it was.

28.     As previously noted, the harm caused by the prepay scheme and Citigroup's participation with regard thereto are the subject of the Financial Institution Adversary. This action, on the other hand, addresses the acceleration of the repayment of the June 2001 Prepay – an acceleration that Citigroup sought to accomplish only 20 days prior to the Petition Date to unjustly enrich itself at the expense of the estate and other creditors of the Debtor Plaintiffs.

## B.     The June 2001 Prepay

29.     The June 2001 Prepay was structured to resemble a 180-day finan-cially settled prepayment swap transaction for natural gas involving Enron, ENA, Citi-bank, and Delta Energy Corporation ("Delta"). The prepayment structure was effectu-

ated by the use of a circular series of financially settled natural gas swaps, consisting of three swap transactions between ENA, Citibank and Delta.

30.     In the first step of the transaction, ENA entered into a swap transaction confirmation with Citibank on June 28, 2001 (the "ENA/Citibank Swap"), under which ENA agreed to pay Citibank a fixed payment equal to approximately $255,598,027 on December 28, 2001 (the "Final Payment").  In exchange, Citibank agreed to pay ENA a floating payment on December 28, 2001, equal to the product of (i) the Notional Quantity Per Calculation Period (61,652,281 MMBtu) and (ii) the settlement price on December 27, 2001 of the NYMEX Henry Hub Natural Gas Futures Contract for the January 2002 delivery month (the "Floating Payment"), which ultimately equaled approximately $250,000,000.  Enron guaranteed all obligations of ENA to Citibank under the ENA/Citibank Swap pursuant to a Guaranty dated June 28, 2001, entered into by Enron in favor of Citibank (the "Citibank Guaranty").

31.     In the second step of the transaction, Citibank entered into a similar swap transaction confirmation with Delta on June 28, 2001 (the "Citibank/Delta Swap"), under which: (i) Citibank agreed to pay Delta a fixed payment equal to $0.00; and (ii) Delta agreed to pay Citibank the Floating Payment, with all payments to occur on December 28, 2001.  However, unlike the ENA/Citibank Swap, the Citibank/Delta Swap required Citibank to facilitate an upfront payment to Delta on June 28, 2001, equal to approximately $249,500,000.

32.     The third step of the transaction was completed by Delta entering into a swap transaction confirmation with ENA on June 28, 2001 (the "Delta/ENA Swap"), which was virtually identical to the Citibank/Delta Swap, pursuant to which (i) Delta agreed to pay ENA a fixed payment equal to $0.00 on December 28, 2001, (ii) ENA agreed to pay Delta the Floating Payment on December 28, 2001, and (iii) Delta

made an upfront payment to ENA on June 28, 2001, equal to approximately $249,500,000. As with the ENA/Citibank Swap, Enron guaranteed all obligations of ENA to Delta under the Delta/ENA Swap pursuant to a Guaranty dated June 28, 2001, entered into by Enron in favor of Delta (the "Delta Guaranty").

33.     The net effect of these circular transactions is that on June 28, 2001, ENA received a $249,500,000 prepayment from Citibank through its affiliated entity and alter ego, Delta. On December 28, 2001, ENA would pay directly to Citibank the Final Payment of $255,598,027, which would consist of the original payment from Citibank in the amount of $249,500,000, plus an additional agreed upon amount for use of the funds (i.e., interest).

34.     In economic substance, Citibank had made a loan to ENA that ENA was to repay with interest. The commodities price risk was effectively eliminated as a result of the circular nature of the structure and the only remaining risk in the transactions was the risk that ENA would not be able to make the fixed payment. The risk of nonpayment by ENA to Citibank was reduced by the Citibank Guaranty and the Delta Guaranty. The net effect – a disguised quarter-billion dollar loan intended by the Defendants and the Insiders to mask Enron's indebtedness.

**C.       Acceleration of Repayment of the June 2001 Prepay**

35.     Shortly after this June 2001 Prepay closed, however, the Insiders' schemes began to unravel. In August, 2001 Jeffrey Skilling, Enron's Chief Executive Officer, abruptly resigned. In response, Enron employee Sherron Watkins wrote her infamous letter to Kenneth Lay, Enron's Chairman, advising of the potential that the Insiders' accounting shenanigans would be discovered. Shortly thereafter, Enron initiated an internal investigation to address these matters.

36.     In September 2001, Enron approached Citigroup again to provide quarter-end support through another prepay transaction.  This time, however, Citigroup declined, because an additional prepay would have increased Citigroup's unsecured Enron exposure to more than one billion dollars.

37.     On October 16, 2001, Enron announced that it would take an "after-tax non-recurring charge" of $1.01 billion in the third quarter of that year.  This triggered the public wave of concern and scrutiny of Enron's operations.

38.     Just over a week later, on or about October 24, 2001, Andrew Fastow, Enron's Chief Financial Officer and an Insider who was at the core of the scheme to manipulate Enron's financial condition, was terminated.  On October 28, 2001 the Enron Board established the Powers Committee, a special committee of the Board, to investigate the financial dealings of the Insiders.

39.     These events raised numerous red flags for Citigroup.  In this environment of extreme public scrutiny and with rumors of Enron's imminent bankruptcy filing, the Defendants orchestrated the Prepay Takeout Transaction.

**D.     The Prepay Takeout Transaction**

40.     By late October 2001, Citibank was aggressively pursuing due diligence to determine whether additional sources of funds could be extracted from Enron's assets and to identify opportunities to reduce its exposure to Enron, which then exceeded $850 million.   At the same time, Enron was desperately seeking means to increase short term liquidity, restore market confidence and maintain investment grade credit ratings to avoid a cascade of defaults under its various financing structures that would precipitate a bankruptcy filing.

41.     On information and belief, in late October Citibank suggested that Enron could obtain up to $1.2 billion in financing through Transwestern Pipeline Com-

pany, a Delaware corporation, that was then an indirect wholly owned subsidiary of Enron and a direct wholly owned subsidiary of ETSC ("Transwestern") and Northern Natural Gas Company, a Delaware corporation, that was then an indirectly wholly owned subsidiary of Enron and a direct wholly owned subsidiary of ETSC ("NNG", and collectively with Transwestern, the "Pipelines").

42.     On November 1, 2001, Enron transferred $8 million to Citibank to cover initial advisory fees in connection with the potential financing through the Pipelines.

43.     In the last days of October and the first days of November 2001, Citibank negotiated the fundamental terms of the Prepay Takeout Transaction with officers of Enron's Global Finance division, identified by the Enron Examiner as the hub of Enron's financial statement manipulation efforts, including Dan O. Boyle, Ben L. Glisan, Barry Schnapper and Kevin Howard. Dan O. Boyle was Enron's point person in the negotiation of the Prepay Takeout Transaction.

44.     Dan O. Boyle and Ben L. Glisan were indicted along with Andrew Fastow on May 1, 2003 for a litany of securities fraud and related charges. On November 3, 2004, Dan O. Boyle was convicted for conspiracy to commit wire fraud and conspiracy to falsify books, records and accounts and lying to a Congressional investigator in connection with the now infamous Nigerian barge deal. He is awaiting sentencing. Ben L. Glisan pleaded guilty to various crimes, including conspiracy to commit wire and securities fraud and is currently serving a 5-year sentence in federal prison. On January 14, 2004, Andrew Fastow pleaded guilty to one count of conspiracy to commit wire fraud and wire and securities fraud. He entered a plea agreement under which he would serve 10 years in federal prison, forfeit $23.8 million in cash and property, including homes in Galveston and Vermont, and forfeit claims on another $6 million. He

is currently cooperating with federal authorities and awaiting sentencing.  On March 12,

2003, Kevin Howard was charged with violations of the 1933 Securities Act and the 1934

Exchange Act.  He is currently scheduled to begin his trial on April 1, 2005.

45.     Enron, through its Global Finance division, directed the negotiation

of the Prepay Takeout Transaction terms with little or no input from officers of the Pipe-

lines who also were officers of Enron, or Enron's Global Finance division.  Thus, when

asked by General Counsel for the Pipelines, Enron's Managing Director of Finance, who

also served as Chief Financial Officer for the Pipelines, confessed: "This is one of those

deals where the guy who wants the deal, wants it so bad, that they will give away a part

of the store to get it."   Further, on November 1, 2001, an email was sent on behalf of

Ken Lay, as Chairman of the Board of Enron, in which he announced:

> We have executed a commitment letter with two of our longstanding
> partners, JPMorgan  (the investment banking arm of JPMorgan Chase &
> Co.) and Salomon Smith Barney (the investment banking arm of Citigroup
> Inc.), that will provide us with additional secured direct lines worth $1 bil-
> lion .  Our Northern Natural Gas Company and Transwestern Pipeline
> Company will support these assets.  The proceeds will be used to supple-
> ment short-term liquidity and to refinance maturing obligations.

> The pipelines are *not* being sold.  **Enron is only using these assets for this
> new credit line** (Emphasis added).

46.     Citibank designed the Prepay Takeout Transaction to accomplish

the borrowing and: (i) to convert a $250 million prepetition unsecured obligation into a

secured obligation and thereby decrease Citigroup's exposure in the impending  Enron

bankruptcy;  (ii) to mask the transfer so as to avoid the otherwise obvious preferential

transfers by running the transaction through two subsidiary entities that were intended

to be made "bankruptcy remote" at Citigroup's insistence;  and (iii) to provide a modi-

cum of short term liquidity to delay any bankruptcy filing of the Debtor Plaintiffs at

least beyond the 90-day preference look back period in section 547(b)(4)(A) of the Bank-

ruptcy Code.

47.     The Prepay Takeout Transaction purportedly permitted Enron to borrow one billion dollars in new secured financings – with $400 million provided by JPMorgan Chase and $600 million provided by Citigroup.  In fact, however, Citigroup provided only $350 million in new money – while using the balance of the funds to convert the $250 million unsecured June 2001 Prepay to a $250 million secured obligation.  Citigroup accomplished that objective through the circuitous steps described below.

48.     On November 13, 2001, Transwestern, as borrower, entered into a Credit Agreement with the lenders named therein, CNAI and JPMorgan Chase Bank, as co-administrative Agents, CNAI, as paying agent, and JPMorgan Chase Bank, as collateral trustee (the "Transwestern Credit Agreement"), and on November 19, 2001, Northern Natural Gas Company, as borrower, entered into a Credit Agreement with the lenders named therein, CUSA and JPMorgan Chase Bank, as co-administrative Agents, CUSA, as paying agent, and JPMorgan Chase Bank, as collateral trustee (the "NNG Credit Agreement," together with the Transwestern Credit Agreement, the "Credit Agreements").

49.     While actively discussing Enron's precarious financial condition internally at the time, the Defendants structured the Prepay Takeout Transaction in a manner anticipating and intended to evade any challenge to, or avoidance of, the Prepay Takeout Transaction under bankruptcy law or applicable state law.  In addition to the list of measures described below, including efforts to make the Pipelines "bankruptcy remote", the Defendants included certain indemnity provisions in the Credit Agreements (the "Pipeline Indemnities") purporting to require the Pipelines to indemnify the Defendants from and against any liabilities arising out of the financing, includ-

ing the Prepay Takeout Transaction, that the Defendants anticipated would be the subject of avoidance litigation in the likely event of a bankruptcy filing.

50. In connection with the Credit Agreements, pursuant to: (i) a certain Amendment, Modification, Assignment and Assumption Agreement dated as of November 13, 2001, by and among Delta, CNAI, CUSA, ENA, Enron, and Citibank; (ii) a certain Amendment and Modification Agreement dated as of November 12, 2001, by and between Delta and Citibank; and (iii) the other assignment documents set forth below, the following actions were effectuated:

A. Cancellation of Floating Payments. Simultaneously, ENA, Delta and Citibank cancelled the Floating Payments payable on December 28, 2001 under the ENA/Citibank Swap, the Citibank/Delta Swap, and the Delta/ENA Swap components of the June 2001 Prepay.

B. Cancellation of Final Payment. Citibank and ENA cancelled the Final Payment of $255,598,027 payable in December by ENA to Citibank in return for ENA's agreement to pay to Citibank the following amounts, which total $254,617,654 (the prorated sum of the Final Payment), plus certain increases if the payments were not made on the relevant funding dates (collectively, the "Termination Payments"):

(i) $137,500,000 on the initial funding date set forth in the Transwestern Credit Agreement;

(ii) $112,500,000 on the initial funding date set forth in the NNG Credit Agreement;

(iii) $2,664,979 on the initial funding date set forth in the Transwestern Credit Agreement; and

(iv)     $1,952,675 on the initial funding date set forth in the NNG Credit Agreement.

C.     <u>Assignments by Citibank to CNAI and CUSA</u>.  Citibank assigned to: (i) CNAI the $137,500,000 payment rights set forth in subparagraph B (i) above; and (ii) CUSA the $112,500,000 payment rights set forth in subparagraph B (ii) above.

D.     <u>Assignment by ENA to Enron</u>.  In consideration of a full and complete extinguishment of intercompany liability owed by Enron to ENA in an amount equal to the Termination Payments, Enron assumed the Termination Payments of ENA and Citibank released ENA from any liability arising from the Termination Payments.

E.     <u>Cancellation of the Guaranties</u>.  Citibank and Delta: (i) acknowledged that all obligations of ENA were fully satisfied and discharged; (ii) cancelled and terminated the Citibank Guaranty and the Delta Guaranty; and (iii) discharged and released Enron from any liability under the Citibank Guaranty and the Delta Guaranty.

F.     <u>Assignment by Enron to Transwestern</u>.  As required by the Transwestern Credit Agreement, CNAI, Enron, and Transwestern then entered into a certain Transwestern Assignment and Assumption Agreement dated as of November 13, 2001 (the "Transwestern Assignment"), whereby Enron assigned and Transwestern assumed the $137,500,000 payment obligation assumed by Enron under paragraph D. above.  In exchange for the Transwestern Assignment, Enron contemporaneously delivered a Subordinated Promissory Note, dated November 13, 2001, in favor of Transwestern, and CNAI agreed to release and dis-

charge Enron from any further liability with respect to the $137,500,000 payment obligation.

      G.    <u>Assignment by Enron to NNG</u>.  As required by the NNG Credit Agreement, CUSA, Enron, and NNG then entered into a certain NNG Assignment and Assumption Agreement dated as of November 19, 2001 (the "NNG Assignment"), whereby Enron assigned and NNG assumed the $112,500,000 payment obligation assumed by Enron under paragraph D. above. In exchange for the NNG Assignment, Enron contemporaneously delivered a Subordinated Promissory Note, dated November 19, 2001, in favor of NNG and CUSA agreed to release and discharge Enron from any further liability with respect to the $112,500,000 payment obligation.

      51.    Pursuant to the Credit Agreements and other assignment documents described above, the Enron subsidiaries Transwestern and NNG assumed the Final Payment obligations under the June 2001 Prepay and ENA, Delta, Citibank and Enron released each party from their respective obligations thereunder and the June 2001 Prepay was thereby terminated.

      52.    In connection with the closings: (i) on or about November 14, Transwestern paid Citigroup $8,791,667 consisting of a $3,300,000 structuring fee, a $3,300,000 underwriting fee, a $2,166,667 final advisory fee and a $25,000 agency fee; and (ii) on or about November 21, 2001, NNG paid Citigroup $7,258,333 consisting of a $2,700,000 structuring fee, a $2,700,000 underwriting fee, a $1,833,333 final advisory fee and a $25,000 agency fee. No less than $5,000,000 of these closing fees directly relate to the Prepay Takeout Transaction.

      53.    Further, on November 13, 2001, Transwestern executed a certain Security Agreement, pursuant to which it granted CNAI, as Paying Agent under the

Transwestern Credit Agreement, a security interest in each and every contract, receivable and general intangible, all inventory, equipment, investment property, fixtures, cash and the proceeds of all of the foregoing, including the Subordinated Promissory Note in the sum of $137,500,000 delivered by Enron to Transwestern, among other things, as security for the $550 million obligation incurred under the Transwestern Credit Agreement.

54.    In addition, at the insistence of the Defendants, Enron (i) caused ETSC to incorporate Transwestern Holding Company, Inc. ("Transwestern Holding") and capitalize it with all of the capital stock of Transwestern; (ii) caused Transwestern to execute a certain Stock Pledge Agreement pursuant to which Transwestern Holding pledged its interest in all capital stock of Transwestern as additional security in connection with the Transwestern Credit Agreement; and (iii) caused Transwestern Holding to enter into a Voting Trust Agreement dated November 14, 2001, pursuant to which CNAI was granted a "golden share" and thereby could prohibit Transwestern from voluntarily filing for bankruptcy relief.  At all relevant times, ETSC, Transwestern and Transwestern Holding shared common officers and directors.

55.    Further, on November 19, 2001, NNG executed a certain Security Agreement, pursuant to which it granted JPMorgan Chase Bank, as Collateral Agent, under the NNG Credit Agreement a security interest in each and every contract, receivable and general intangible and the proceeds of all of the foregoing, including the Subordinated Promissory Note in the sum of $112,500,000 delivered by Enron to NNG, among other things, as security for the $450 million obligation incurred under the NNG Credit Agreement.

56.    In addition, at the insistence of the Defendants, Enron (i) caused ETSC to incorporate NNGC Holding Company, Inc.  ("NNGC Holding", collectively

with Transwestern Holding the "Pipeline Holding Companies") (ii) caused NNGC Holding to execute a certain Stock Pledge Agreement dated November 19, 2001, pursuant to which NNGC Holding pledged its interest in all capital stock of NNG as additional security in connection with the NNG Credit Agreement; and (iii) caused NNGC Holding to enter into a Voting Trust Agreement dated November 19, 2001, pursuant to which CUSA was granted a "golden share" and thereby could prohibit NNG from voluntarily filing for bankruptcy relief. At all relevant times, ETSC, NNG, NNGC Holding and all intervening entities of the corporate family shared common officers and directors.

57.    The value of property and pledges provided as security by Transwestern, NNG, and the Pipeline Holding Companies, greatly exceeded the amounts financed.

58.    As still additional collateral, Enron executed a Guaranty Agreement in connection with both Credit Agreements pursuant to which it guaranteed the respective obligations of Transwestern and NNG under the Credit Agreements in an amount totaling $1 billion, including the Prepay Takeout Transaction, and all obligations and transfers supporting the Prepay Takeout Transaction (e.g., the Pipeline Indemnities).

59.    In connection with the Prepay Takeout Transaction, Enron and ETSC thus incurred significant new obligations and caused various direct and indirect wholly owned subsidiaries to transfer valuable interests in property to or for the benefit of Citigroup and thereby diminished the value of Debtor Plaintiffs' estates. For example, ETSC, for the benefit of Citigroup, was required to transfer all of the capital stock of the Pipelines to newly formed entities to insulate the Pipelines from bankruptcy and substantive consolidation with Enron in the event of a bankruptcy filing. The Pipelines

granted the Defendants liens on their property to secure their portion of the $1 billion despite having received only $750 million, while diminishing ETSC's equity interest in the Pipelines, and ceding to the Defendants control over those entities' ability to seek bankruptcy relief. Further, Enron and the Defendants required the Pipelines to incur enormous transactional costs in connection with the Prepay Takeout Transaction, a highly complex structured transaction, which was created for the benefit of the Defendants.

60. Further, pursuant to the Credit Agreements, the Termination Payment was structured to be a separate transaction from the financing provided by JPMorgan Chase. CNAI and CUSA "loaned" the funds under this aspect of the transaction, and the funds "loaned" to Transwestern and NNG were only "deemed" to have been funded by CNAI and CUSA, in their respective shares. In fact, no funds were loaned. Thus, the Termination Payment was "converted" to a secured obligation of the Pipelines.

61. As a result of the foregoing, Enron borrowed $137,500,000 from Transwestern and $112,500,000 from NNG, as documented by the subordinated notes entered in conjunction therewith. But having agreed to enter those notes, Enron directed that the Pipelines assume ENA's obligations through Enron in order to obtain what was actually a $750 million funds transfer for Enron's benefit, in exchange for the Pipelines granting the Defendants $600 million in liens on their assets. Transwestern and NNG complied with Enron's direction by permitting their respective shares of the Citigroup borrowing in the amount of $600 million to be reduced by $250 million and to have that amount instead be "deemed" to have been provided in satisfaction of the principal portion of the Termination Payment. Consequently, Transwestern and NNG were now obligated to make the Termination Payment to or for the benefit of Citibank,

despite having received nothing but promissory notes from an insolvent corporate parent known to be on the precipice of bankruptcy. The effect of the Prepay Takeout Transaction was clear; the equity value of Transwestern and NNG (property of Enron and ETSC) was diminished due to their incurring $250 million in obligations in exchange for notes of no value.

62.     Defendants were aware that the same transaction could have more easily been accomplished by a straightforward borrowing of the Pipelines, followed by a loan or dividend of the loan proceeds to Enron.  Moreover, the Pipelines were indifferent about the uncollectibility of Enron's notes because they regarded themselves as property of Enron – which controlled them and could compel them to declare a dividend to the parent.  Nevertheless, the Defendants created the complex Prepay Takeout Transaction because the more straightforward approach was clearly subject to challenge or avoidance.  Enron's and Defendants' use of the Pipelines in the Prepay Takeout Transaction and the resulting diminishment of the equity value of the Pipelines constituted a preferential transfer to Citigroup.

63.     Despite ENA's purported assignment of the Termination Payment to Enron and Enron's assignment of said obligations to Transwestern and NNG in their respective shares, on or about November 19, 2001, ENA wired the sum of $2,664,979.00 directly to Citibank and on or about November 21, 2001, ENA wired the sum of $1,993,973.00 directly to Citibank (the "Wire Transfers") in satisfaction of a portion of the Final Payment.  The Wire Transfers constituted payment of that component of the Final Payment that represents the interest component of the disguised loan of $250 million through the June 2001 Prepay.

E.    **Citigroup's Contemporaneous Actual Knowledge**

64.    At the time of undertaking the Prepay Takeout Transaction, Citigroup understood and appreciated that the risk of a near-term Enron bankruptcy was substantial.  By early November 2001, Citigroup recognized that there would be a significant cash shortfall associated with Enron's ability to pay its debts as they came due.  Because of Enron's lack of access to capital markets, Citigroup further recognized that Enron's corporate credit rating would likely be downgraded to below investment grade.  And Citigroup understood well that Enron had at least two significant structured finance transactions (Marlin and Osprey) that were tied to Enron's credit rating which would trigger Enron's obligation to repay approximately $5.3 billion of debt upon the downgrading of Enron's credit rating below investment grade.  Consequently, Citigroup understood the high risk that Enron would be out of cash by late November or early December 2001, due to sizable maturity scheduled to become due at the close of the fourth quarter of 2001 – including the scheduled repayment of the $250 million June 2001 Prepay.

65.    As alleged above, Citigroup, therefore, devised a plan to cut its losses by transforming the unsecured June 2001 Prepay into a secured financing so as to strengthen Citigroup's hand in the coming bankruptcy at the expense of the Debtor Plaintiffs' estates and all other unsecured creditors.  Citigroup designed the Prepay Takeout Transaction not simply to provide $350 million of new money from Citigroup to Enron and its affiliates, but also to roll the $250 million unsecured obligation of ENA into the secured Pipeline Credit Agreements *pro rata*.  Citigroup expressly made collateralization of the unsecured prepetition debt of ENA a precondition to its participation in the purported $1 billion financing.  Moreover, Citigroup explicitly recognized that if bankruptcy were to occur in the 90 day period post-transaction, the direct repayment of

the June 2001 Prepay by Enron or ENA or any affiliate filing bankruptcy would be treated as an avoidable preference.

66.     In view of this known risk of Enron's near-term bankruptcy, Defendants attempted to design the Prepay Takeout Transaction as an "avoidance proof" transaction because they appreciated the certainty of a challenge to the Prepay Takeout Transaction in the event that Enron sought bankruptcy protection shortly after closing the Prepay Takeout Transaction. Defendants therefore structured the complex multi-tiered transactions described above and also required that Enron cause the Pipelines to execute the Pipeline Indemnities in order to insulate Defendants from liability, should the Prepay Takeout Transaction ever be avoided or otherwise successfully challenged.

67.     The Pipeline Indemnities were created to steer any liability arising from an avoidance action or other challenge of the Prepay Takeout Transaction away from Defendants and back to the Debtor Plaintiffs and the Pipelines.  Defendants sought to make any avoidance or rescission remedy illusory, should the Prepay Takeout Transaction fail to withstand a challenge under applicable Bankruptcy or state law in any subsequent bankruptcy proceedings relating to Enron.  As such, the Pipeline Indemnities, as they relate to the Prepay Takeout Transaction, were obligations incurred by or through the Debtor Plaintiffs for the unjust benefit of Defendants without reasonably equivalent or fair value.  The Pipeline Indemnities were also intended to hinder or delay other present or future creditors by preventing them from obtaining an effective recovery if the Prepay Takeout Transaction were avoided or otherwise challenged; allowing Citigroup to retain its profit even if the Prepay Takeout Transaction was later found to have been unenforceable or unlawful.

68.     The totality of the Prepay Takeout Transaction, including the Pipeline Indemnities, was a series of transactions designed to appear to be separate events

involving distinct entities, when Defendants' true purpose was simply to invent a means to secure $250 million of Citibank's unsecured debt of ENA and Enron by this integrated scheme designed to deplete the Debtor Plaintiffs' assets to the detriment of other unsecured creditors.

69.     Citigroup's design was acknowledged by the Pipelines in connection with an investigation by the Federal Energy Regulatory Commission ("FERC") that resulted in FERC issuing an Order to Respond on August 1, 2002 to the Pipelines.  The Order to Respond in pertinent part states:

    i.   "During staff's audit in early May 2002, the Director of Financial Accounting and Reporting for Transwestern and Northern indicated that Enron had the pipelines take out the November 2001 loans to try to hold off a declaration of bankruptcy;"

    ii.   "Interviews with Transwestern's Manager of Financial Accounting and Reporting revealed that the $137.5 million was used to pay off a portion of a $250 million unsecured loan outstanding by Enron North America, another Enron subsidiary, to Citibank (a member of Citigroup);" and

    iii.   "On November 19, 2001, Enron entered into an assignment and assumption agreement with Northern for $112.5 million.  This amount was used to payoff the remainder of the Enron North America unsecured loan discussed above."

70.     Based upon the foregoing, within one year of the Petition Date, the Debtor Plaintiffs transferred valuable interests in property and incurred obligations with actual intent to hinder or delay entities to which Enron was or became indebted at

the time the transfers were made and the obligations were incurred or otherwise received less than reasonably equivalent or fair value in exchange for such transfers.

71.     In furtherance of their scheme, Defendants have now made demand on Transwestern to perform under the Pipeline Indemnity as a direct result of this action challenging the Prepay Takeout Transaction.  The Debtor Plaintiffs have, in turn, accepted responsibility for defending Transwestern under the terms of its indemnity undertaking in the November 2004 Purchase Agreement Amendment by and among Enron Corp., Enron Operations Services, LLC, Enron Transportation Services, LLC, and EOC Preferred, LLC, as Sellers, and CCE Holdings, LLC, as Purchaser of Transwestern, under which Transwestern was sold to a third party.

72.     On information and belief, Defendants have now made demand on NNG to perform under the Pipeline Indemnity as a direct result of this action challenging the Prepay Takeout Transaction.  NNG has asserted a claim against Enron in connection with the Pipeline Indemnity, which NNG claims is entitled to administrative priority.

73.     In viewing these events, Plaintiffs submit that the court should disregard the artifices created at Defendants' behest in order to shield the Prepay Takeout Transaction from judicial scrutiny.  The Prepay Takeout Transaction is not a series of unrelated transactions between independent parties.  It is, in reality, a single integrated transaction.  The Court should evaluate the entire scheme undertaken by Defendants, in light of the fact that, through the Prepay Takeout Transaction, Defendants knowingly and intentionally sought to deplete the Debtor Plaintiffs' asset base for their benefit, by means of a series of direct and indirect transactions specifically designed to extract $250 million from Debtor Plaintiffs facing imminent financial collapse, in a manner con-

sciously constructed to evade or frustrate any of the remedies now sought in this
Amended Complaint.

**COUNT I**
**(Avoidance of the Citi Preferential Transfers)**

74.     The preceding paragraphs are realleged and incorporated by refer-
ence.

75.     As summarized in the following table, within ninety (90) days prior
to the Petition Date, (i) Enron, and ETSC, directly or through a conduit, made or caused
to be made, transfers of their respective interests in property in an amount no less than
$250 million by means of pledging the capital stock and further encumbering the assets
of certain indirectly and directly wholly owned subsidiaries and (ii) Enron or ENA
made or caused to be made certain cash transfers in connection with the termination of
the June 2001 Prepay, all to or for the benefit of the identified transferees on or about the
dates specified below:

| TRANSFEROR | OBLIGOR | INITIAL TRANSFEREE or BENEFICI- ARY | SUBSEQUENT TRANSFEREES | INITIAL TRANSFER DATE | TRANSFER AMOUNT |
|---|---|---|---|---|---|
| ENA | ENA | Citibank | | 11/19/2001 | $2,664,979.00 |
| Enron or ETSC | ENA and/or Enron | CNAI; Citibank | Citibank | 11/13/2001 | $137,500,000.00 |
| ENA | ENA | Citibank | | 11/21/2001 | $1,993,973.00 |
| Enron or ETSC | ENA and/or Enron | CUSA; Citibank | Citibank | 11/21/2001 | $112,500,000.00 |

76.     The transfers identified in the foregoing table, together with any in-
terest, fees, and other payments to or for the benefit of Citigroup related to the Prepay
Takeout Transaction, are referred to herein as the "Preferential Transfers."

77.     The Preferential Transfers constitute transfers of interests in prop-
erty of Enron, ENA and/or ETSC.

78.     Each of the Preferential Transfers were made to or for the benefit of the entities listed in the third column of the foregoing table as initial transferees or beneficiaries.

79.     Each of the Preferential Transfers were made to or for the benefit of a creditor for or on account of an antecedent debt owed by Enron or ENA before the transfer was made.

80.     Upon information and belief, at the time each of the Preferential Transfers were made, Enron, ENA and ETSC were insolvent for purposes of section 547(b) of the Bankruptcy Code.

81.     Each of the Preferential Transfers enabled the transferees to receive more than they would have received if the case were a case under chapter 7 of the Bankruptcy Code, the transfers had not been made, and the transferees received payment of their debt to the extent provided by the Bankruptcy Code.

82.     The Preferential Transfers are avoidable as preferences under section 547(b) of the Bankruptcy Code.

## COUNT II
### (Avoidance of Intentional Fraudulent Transfers
### Under Section 548(a)(1)(A) of the Bankruptcy Code)

83.     The preceding paragraphs are realleged and incorporated by reference.

84.     On or within one year of the Petition Date; Enron or ETSC (as applicable): (i) transferred the equivalent of $250 million through the roll up of the unsecured June 2001 Prepay into the secured Prepay Takeout Transaction;  (ii) impaired the value of their equity interest in the Pipelines by pledging the capital stock and further encumbering the assets of the Pipelines with $1 billion of new security interests in exchange for only $750 million; (iii) incurred obligations the equivalent of $1 billion in the

form of the Credit Agreement guarantees; (iv) transferred millions in fees; and (v) caused its wholly-owned subsidiaries NNG and Transwestern to enter into the Pipeline Indemnities (collectively, the "Prepay Fraudulent Transfers") all to or for the benefit of the Defendants. All of the Prepay Fraudulent Transfers were made in furtherance of the Prepay Takeout Transaction.

85.     Each Prepay Fraudulent Transfer and Pipeline Indemnity was made as part of a scheme designed and executed with actual intent to hinder or delay one or more entities to which the Debtor Plaintiffs were, or became, on or after the date such transfers were made or such obligations were incurred, indebted. The Prepay Takeout Transaction as a whole, including the Pipeline Indemnities, was an integrated scheme and should be treated as a direct transaction between the Debtor Plaintiffs and Defendants in all respects.

86.     Each Prepay Fraudulent Transfer and Pipeline Indemnity is avoidable under section 548(a)(1)(A) of the Bankruptcy Code.

### COUNT III
**(Avoidance of Intentional Fraudulent Transfers Under Section 544 of the Bankruptcy Code)**

87.     The preceding paragraphs are realleged and incorporated by reference.

88.     Each Prepay Fraudulent Transfer and Pipeline Indemnity was made as part of a scheme designed and executed with actual intent to hinder or delay one or more entities to which Debtor Plaintiffs were, or became, on or after the date such transfers were made or such obligations were incurred, indebted. The Prepay Takeout Transaction as a whole, including the Pipeline Indemnities, was an integrated scheme and should be treated as a direct transaction between the Debtor Plaintiffs and Defendants in all respects.

89.     Each Prepay Fraudulent Transfer and Pipeline Indemnity is avoidable under section 544 of the Bankruptcy Code and applicable nonbankruptcy law.

## COUNT IV
**(Avoidance of Constructively Fraudulent Transfers
Under Section 548(a)(1)(B) of the Bankruptcy Code)**

90.     The preceding paragraphs are realleged and incorporated by reference.

91.     Enron and in certain cases ETSC received less than a reasonably equivalent value from the transferee in exchange for the Prepay Fraudulent Transfers and the Pipeline Indemnities.

92.     Upon and information and belief, when the Prepay Fraudulent Transfers and Pipeline Indemnities were made, Enron and, ETSC were insolvent, or became insolvent as a result of the transfers; or were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

93.     The Prepay Takeout Transaction as a whole, including the Pipeline Indemnities, was an integrated scheme and should be treated as a direct transaction between the Debtor Plaintiffs and Defendants in all respects.

94.     The Prepay Fraudulent Transfers and Pipeline Indemnities are avoidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT V
**(Avoidance of Constructively Fraudulent Transfers
Under Section 544 of the Bankruptcy Code)**

95.     The preceding paragraphs are realleged and incorporated by reference.

96.     Enron and in certain cases ETSC received less than a reasonably equivalent, or fair, value from the transferee in exchange for the Prepay Fraudulent Transfers and the Pipeline Indemnities.

97.     Upon and information and belief, when the Prepay Fraudulent Transfers and Pipeline Indemnities were made, Enron and, ETSC were insolvent, or became insolvent as a result of the transfers; or were engaged in business or a transaction, or were about to engage in business or a transaction, for which their remaining property was unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

98.     The Prepay Takeout Transaction as a whole, including the Pipeline Indemnities, was an integrated scheme and should be treated as a direct transaction between the Debtor Plaintiffs and Defendants in all respects.

99.     The Prepay Fraudulent Transfers and Pipeline Indemnities are avoidable as fraudulent transfers under section and 544 of the Bankruptcy Code and applicable nonbankruptcy law.

## COUNT VI
### (Recovery of Avoidable Transfers)

100.     The preceding paragraphs are realleged and incorporated by reference.

101.     To the extent that the Preferential Transfers, Prepay Fraudulent Transfers are avoidable under Bankruptcy Code sections 105(a), 544, 547 or 548, then, pursuant to section 550 of the Bankruptcy Code, the Plaintiffs may recover from Citigroup, or from any immediate or mediate transferee of Citigroup, the property transferred, or the value of such property, for the benefit of the Debtor Plaintiffs' respective bankruptcy estates.

33

## COUNT VII
### (Disallowance of Claims Under Bankruptcy Code Section 502(d))

102.    The preceding paragraphs are realleged and incorporated by reference.

103.    By reason of the foregoing facts and pursuant to Bankruptcy Code section 502(d), the claims of Citigroup must be disallowed unless and until it has turned over to Plaintiff the property transferred, or paid Plaintiffs the value of such property, for which it is liable under Bankruptcy Code section 550.

## COUNT VIII
### (Equitable Subordination Under Section 510(c)(1)
### and 105(a) of the Bankruptcy Code)

104.    The preceding paragraphs are realleged and incorporated by reference.

105.    Citigroup filed various proofs of claim against the Debtor Plaintiffs' estates.

106.    Citigroup engaged in inequitable conduct, including the conduct described herein, that has resulted in injury to creditors or the conferring of an unfair advantage on Citigroup.  This inequitable conduct has resulted in harm to the Debtor Plaintiffs' bankruptcy estates and to the entire creditor body, in that general unsecured creditors have been induced to extend credit without knowledge of the actual facts regarding the respective Debtor Plaintiffs' financial condition, and general unsecured creditors are less likely to recover the full amounts due them because of the conduct of Citigroup.

107.    Under principles of equitable subordination, all claims asserted against the Debtor Plaintiffs by, or on behalf of, or for the benefit of Citigroup or its affiliated entities should be subordinated for purposes of distribution, pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code.

108. Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

109. For the reasons alleged in this Count VIII, to the extent that any of the Defendants is determined to have a lien on property of a Debtor Plaintiff's estates, the Court should enter an order transferring such lien to the Debtor Plaintiff's estates, pursuant to sections 510(c)(2) and 105(a) of the Bankruptcy Code.

## COUNT IX
**(Unjust Enrichment)**

110. The preceding paragraphs are realleged and incorporated by reference.

111. Through the Prepay Takeout Transaction, Defendants received lien and security interests in the assets of Debtor Plaintiffs' wholly owned subsidiaries, thereby diminishing the value of the assets of Debtor Plaintiffs' estates and the values which would otherwise have been available to other unsecured creditors. Defendants further caused the Debtor Plaintiffs to incur new guaranty and other obligations and transfer or pledge stock and controlling interests in a variety of valuable assets. Defendants also obtained the Pipeline Indemnities from Enron and entities which it controlled. In so doing, the Defendants unjustly enriched themselves at the expense of the Debtor Plaintiffs' estates and creditors. The Defendants did so with the expectation that a bankruptcy of the Debtor Plaintiffs was imminent and the knowledge and intent that their financial manipulations, if permitted, would avoid the bankruptcy priority scheme by: (i) transforming Citigroup's unsecured $250 million June 2001 Prepay claim to a secured claim with priority over other unsecured creditors; or (ii) making any remedy imposed to avoid or reverse the Prepay Takeout Transaction illusory.

112.     The Prepay Takeout Transaction as a whole, including the Pipeline Indemnities, was an integrated scheme and should be treated as a direct transaction between the Debtor Plaintiffs and Defendants in all respects.

113.     As set forth above, Defendants were unjustly and grossly enriched and received money to which they were not entitled, and which the Debtor Plaintiffs and their affiliates should not have been required to pay.

114.     In equity and good conscience, each of the Defendants should be required to return the value derived from the schemes alleged above – including the return of the $250 million – and should not be entitled to enforce the Pipeline Indemnities.

**COUNT X**
**(Declaratory Relief)**

115.     The preceding paragraphs are realleged and incorporated by reference.

116.     This is a claim for declaratory relief brought against the Defendants pursuant to 28 U.S.C. § 2201.

117.     On December 28, 2004 Defendants made a claim under the Transwestern Pipeline Indemnity against Transwestern (now known as Cross-Country Pipeline Company) (herein "CCE") for indemnity of Citigroup (hereinafter the "Indemnity Claim") from and against any liabilities arising by reason of the claims asserted by Plaintiffs in this Adversary Proceeding.  On December 28, 2004, CCE provided Enron with notice of Citigroup's Indemnity Claim.  On January 14, 2005, Enron notified CCE that it would defend against, negotiate, settle or otherwise deal with the Indemnity Claim pursuant to the terms of the CCE Pipeline Sale Agreement, as amended on November 17, 2004.  There presently exists a real, live, actual and justiciable controversy between Plaintiffs and Defendants concerning whether the Pipeline Indemnities described above may be enforced in a manner rendering all other remedies sought in this

Complaint illusory and thereby preventing Plaintiffs from actually avoiding or challenging the Prepay Takeout Transaction.

118.     Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a judicial declaration that The Prepay Takeout Transaction as a whole, including the Pipeline Indemnities, was an integrated scheme and should be treated as a direct transaction between the Debtor Plaintiffs and Defendants in all respects.  Further, Plaintiffs are entitled to a judicial declaration that the Pipeline Indemnities in particular may be avoided by Plaintiffs in conjunction with determinations in favor of Plaintiffs with respect to one or more of the claims for relief stated above, or that the Pipeline Indemnities are otherwise invalid or unenforceable insofar as they apply to, prevent, hinder, or limit any challenge of the Prepay Takeout Transaction.

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in its favor as follows:

(i)      For an order avoiding and setting aside the transfers and obligations identified in Counts I through V;

(ii)     For an order directing each respective transferee of the transfers to return the property transferred or the value of such property to the Debtor Plaintiffs' bankruptcy estates;

(iii)    For an order disallowing any and all claims of the Defendants unless or until such Defendant has turned over to Plaintiff the property transferred, or paid the Debtor Plaintiffs' bankruptcy estates the value of such property, for which it is liable under section 550 of the Bankruptcy Code;

(iv)     For an order equitably subordinating all claims of the Defendants asserted against the Debtor Plaintiffs, or other af-

filiated Debtors in the related bankruptcy proceedings and for an order transferring to the Debtor Plaintiffs' estates any liens securing the subordinated claims;

(v)    For damages and disgorgement of amounts to be proven at trial, but in no event less than $250 million;

(vi)    For attorneys' fees and costs, and costs of suit;

(vii)    For a declaratory judgment that the Pipeline Indemnities are avoided, invalid or unenforceable insofar as they might otherwise apply to, prevent, hinder, or limit implementation of any remedies sought by Plaintiffs herein; and

(viii)    For such other and further relief as this Court deems just and equitable.

Dated:    New York, New York
             May 11, 2005

ENRON CORP, ENRON NORTH AMERICA
CORP. and ENRON TRANSPORTATION
SERVICES COMPANY,
Reorganized Debtors and Plaintiffs,
By their Bankruptcy Co-Counsel,
TOGUT, SEGAL & SEGAL LLP,
By:

/s/ Frank A. Oswald
FRANK A. OSWALD (FAO-1223)
A Member of the Firm
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000

**[signatures continued on next page]**

Dated:   Cleveland, Ohio               OFFICIAL COMMITTEE OF UNSECURED
           May 11, 2005                    CREDITORS of ENRON CORP, *et al.*
                                     By its Attorneys,
                                     SQUIRE, SANDERS & DEMPSEY LLP,
                                     By:

/s/ Steven B. Harris
HOWARD J. C. NICOLS (HN-3594)
PATRICK J. BROOKS (PB-8065)
4900 Key Tower
127 Public Square
Cleveland, OH  44114 – 1304
(216) 479-8500
                  and
312 Walnut Street, Suite 3500
Cincinnati, Ohio 45202-4036
(513) 361-1200
STEPHEN D. LERNER (SL-7598)
                  and
600 Travis Street, Suite 6250
Houston, Texas 77002-3000
(713) 546-5850
STEVEN B. HARRIS (SH-0531)